UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ANGELA M. FARRELL,                 )
                                   )
                Plaintiff          )
                                   )
        v.                         )   CAUSE NO. 2:10 cv 226
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
                Defendant          )

OPINION AND ORDER

This matter is before the court on the petition for judicial
review of the decision of the Commissioner of Social Security
filed by the claimant, Angela Farrell, on August 23, 2006.  For
the reasons set forth below, the decision of the Commissioner is
**AFFIRMED.**

Background

The claimant, Angela M. Farrell, applied for Disability
Insurance Benefits on May 11, 2005, alleging disability since
November 2, 2003.  (Tr. 11, 113-116)  Her application initially
was denied on July 27, 2005.  (Tr. 77-80, 83-85)  Farrell then
requested a hearing.  (Tr. 717 )  On June 23, 2006, a hearing was
conducted before Administrative Law Judge Richard Harper.  (Tr.
717-750) Farrell and Vocational Expert Janette Clifford, testi-
fied.  (Tr. 718)  On August 3, 2006, the ALJ issued his decision
denying benefits. (Tr. 58-72)

Farrell requested review by the Appeals Council. (Tr. 108)
On February 23, 2007, the Appeals Council remanded the case, and
a second hearing was held before ALJ James Norris on March 20,
2008. (Tr. 106-109, 751) Dr. Paul Boyce, Dr. Jack Thomas,
Farrell, and Constance Brown, Vocational Expert, testified. (Tr.
752-793) The ALJ issued a denial of benefits on November 24,
2008, and the Appeals Council denied Farrell's request for
review. (Tr. 22-36, 7-10)

Farrell was born July 23, 1971, making her 37 years old on
the date of the ALJ's decision. (Tr. 113) She is 4'11" in
height and weighs approximately 227 pounds. (Tr. 334) Farrell
is married and lives with her husband and two children. (Tr.
736, 783) She graduated from high school and has approximately
2 1/2 - 3 years of college, earning an Associate's Degree in
accounting. (Tr. 148) Farrell has been employed as a tax
analyst, research analyst, accounting clerk, bookkeeper, wait-
ress, and cook. (Tr. 151) She was last insured for disability
benefits on December 31, 2009. (Tr. 117)

Farrell's relevant medical treatment, demonstrating possible
mental and physical impairments, began in April 2003 when Dr.
Sara Beyer, Farrell's primary treating physician, reported that
Effexor and Ativan did not help Farrell's panic attacks. (Tr.
330) Dr. Beyer examined her for myalgias, joint pain, and

increased anxiety and prescribed Lexapro for her anxiety. (Tr.
332-34) Farrell also experienced sleep deprivation, difficulty
working, inability to do mundane living tasks, and suicidal
thoughts, but said she would not actually commit suicide. (Tr.
335-36) Following surgical removal of a dorsal ganglion on her
left wrist, Farrell experienced numbness and tingling. (Tr. 297,
336) Farrell was released to work in May 2003, but Dr. Beyer
indicated that Farrell could not function around people secondary
to depression and stress. (Tr. 501, 338) Farrell attempted to
work around July 8, 2003, but she worked only 20 minutes because
she suffered fatigue and shortness of breath during panic attacks
and depression. (Tr. 338) Dr. Beyer directed Farrell to avoid
stressful situations. (Tr. 338)

In July 2003, Dr. Madhu Engineer conducted a psychiatric
assessment and determined that Farrell's GAF was a 51.[1] (Tr.
651) During the following month, Farrell saw Dr. Engineer
because she was experiencing 2-3 panic episodes per week and her
passive suicidal thoughts continued. (Tr. 649) She reported
that her depression had improved about two weeks later, but she

---

[1]The GAF or Global Assessment of Functioning scale measures a "clinician's judgment of the individual's
overall level of functioning." Am. Psychiatric Ass'n, Diagnosis and Statistical Manual of Mental Disorders, Text
Revision, 32, 34 (4th ed. 2000) (DSM IV-TR). The established procedures require a mental health professional
to assess an individual's current level of symptom severity and current level of functioning, and adopt the lower of
the two scores as the final score. Id. at 32–33. A GAF score ranging from 41–50 indicates serious symptoms; scores
ranging from 51–60 indicate moderate symptoms; and scores ranging from 61–70 indicate mild symptoms. Id.

still suffered from daily panic attacks. (Tr. 648) Farrell then saw Laura Bass for counseling. During counseling, Farrell stated that nearly anything could provoke anxiety, and she no longer was able to talk herself out of anxiety. (Tr. 473)

After counseling with Bass, Dr. Beyer referred Farrell to a therapist and psychiatrist because she was unable to work with others, work in a group setting, or supervise. (Tr. 692-93) Farrell also suffered from poor concentration and needed to rest periodically. Therefore, she was unable to perform work activities for extended periods. (Tr. 693)

Farrell next saw Dr. William Carlisle for chiropractic treatment to alleviate neck pain, severe headaches, chronic pain in her lower back, and stomach cramping. (Tr. 508) Spinal x-rays revealed displacement from L3-L5, and her cervical lordosis was flattened indicating muscle spasms. (Tr. 508) Farrell further experienced difficulty bending, walking, and lifting her children. (Tr. 517)

During the same month, Dr. Beyer completed an Attending Physician Statement supporting plaintiff's application for short-term disability and reported that Farrell had been diagnosed with depression and anxiety. (Tr. 692-93) Dr. Beyer further reported that Farrell was unable to work from June to August due to problems concentrating, fatigue, and tearfulness. (Tr. 693) Dr.

Beyer suggested that Farrell had stabilized and could return to work August 11, 2003. (Tr. 693)

In September 2003, Farrell saw Dr. Engineer for continued panic attacks. He described Farrell as stressed and "very anxious." (Tr. 647)

The following month, as Farrell cried in the office, Dr. Beyer indicated that stress and depression led to Farrell's severe fatigue and advised her to avoid stress. (Tr. 341-42) Farrell also experienced severe pain, flushing, and palpitations. (Tr. 342) After seeing Dr. Beyer, Farrell went back to counseling with Bass. (Tr. 478) Farrell told Bass that her medication relieved her pain but that she continued experiencing fatigue and anxiety. (Tr. 478) If not for her children, Farrell stated that she would not want to continue living. She then made a suicide avoidance contract. (Tr. 478)

During November 2003, Farrell admitted herself to Novant Health from November 5-11 after experiencing suicidal thoughts and considering a plan to overdose. (Tr. 383-84) She began taking Klonopin, and her Wellbutrin prescription was increased. (Tr. 383) Farrell engaged in group therapy occasionally but often isolated herself as she remained sad and tearful. (Tr. 384) Her mood improved with group interaction. (Tr. 384) Farrell indicated stress over the fear of losing her job, her

mother suffering from cancer, child care problems, a physically abusive husband, and bankruptcy. (Tr. 383) She further reported feelings of paranoia, visual hallucinations, a decreased energy level, social isolation, lack of appetite, decreased concentration, and frequent awakenings and nightmares. (Tr. 383) The attending physician noted that Farrell engaged well with the staff regarding issues related to her marital conflicts but that her primary anxiety appeared to stem from the thought of marriage counseling with her husband while at the psychiatric unit. (Tr. 384) Ultimately, Farrell denied suicidal thoughts before discharge, and the attending physician said her mood had improved with no evidence of psychosis. (Tr. 384) A diagnosis of Major Depressive Disorder followed, and Farrell was assigned a GAF of 45, indicating serious symptoms. (Tr. 384) The physician recommended that she continue taking Wellbutrin and Gabitril. (Tr. 384)

After her hospitalization, Farrell told Bass that she remained anxious, and Dr. Beyer extended Farrell's absence from work through December 26 as she continued to experience depression, insomnia, and headaches. (Tr. 343, 480) Bass then referred Farrell to the Eastover Psychological and Psychiatric Group for psychiatric treatment with Dr. Scott Wallace. (Tr. 385) Dr. Wallace examined Farrell and noted that she was sad, angry,

irritable, worried, and self-depreciating. (Tr. 385) He indicated abnormal appetite, motivations, anxiety, and sleep patterns. He further reported suicidal ideation without a plan. (Tr. 385) Farrell suffered from problems with judgment and impulse control but was assigned a GAF of 65, indicating mild symptoms. (Tr. 387) Dr. Wallace noted her depression and prescribed Abilify, a neuroleptic medication, at 10 mg. (Tr. 388) Farrell experienced difficulty dealing with the holidays but had no other complaints in mid December. (Tr. 388-89) Her Wellbutrin prescription was increased to 450 mg, and Abilify was increased to 15 mg. (Tr. 388-89) Dr. Wallace indicated that Farrell's mood was within normal limits, and she tolerated her medicine fairly well. (Tr. 389)

The following month, Dr. Wallace noted severe anxiety and doubled Farrell's dosage of Abilify, but later he discontinued this medication because it caused agitation. (Tr. 391) Dr. Wallace increased Farrell's dosage of Xanax because of anxiety. (Tr. 391) Agitation continued through the night, and Farrell's dosage of Seroquel was increased from 100 to 200 mg. (Tr. 391-92) Farrell also complained of right flank pain, but she admitted that she was comfortable because medication reduced the pain. (Tr. 403-04) Farrell further admitted that she had not been on any medication for a week in mid-January. (Tr. 391) By the end

of the month, Farrell stated that she was doing better and had no complaints with the exception of mild nightly agitation. (Tr. 392) Dr. Wallace noted improved affect and good toleration of medication. (Tr. 392)

Farrell saw Dr. Wallace in February 2004 and reported a positive mood with no side effects from her medication. (Tr. 393) She further reported stabilized sleep patterns and appetite and made good insights. (Tr. 393) The following month, Farrell again suffered severe depression and sleep troubles. (Tr. 394) Her Seroquel was increased to 300 mg, Xanax was increased to 2 mg, and Lexapro was prescribed. (Tr. 394)

In April 2004, Farrell reported recurrent joint pain in her right index finger. She had received cortisone injections in that finger which relieved her pain symptoms for a significant period of time. (Tr. 504-05) Dr. Forney Hutchinson, an orthopaedist, noted tenderness near the PIP joint but did not indicate instability. (Tr. 505) X-rays revealed some calcification around the well-maintained joint, and Dr. Hutchinson believed Farrell possibly suffered from psoriatic arthritis. (Tr. 505)

In June 2004, Dr. Wallace noted that Farrell's GAF score had declined from 65 to 30 as she experienced suicidal thinking and poor response to treatment. (Tr. 699) Dr. Beyer recorded both right index finger and sacral pain and injected Kenalog and

Licodaine.  (Tr. 344)  Farrell continued therapy with Bass for
panic attacks, sleep problems, and anxiety, and her GAF score was
50.  (Tr. 481, 484)  Farrell again saw Dr. Beyer in August 2004,
and he found slight edema in both hands with numbness.  (Tr. 345)
Farrell was prescribed Amitriptyline because the medication for
depression and insomnia were not helping.  (Tr. 345)  She also
sampled Axert for migraines and was told to wear wrist splints
for carpal tunnel syndrome.  (Tr. 346)  Farrell reported depres-
sion, fatigue, dizziness, nausea, photophobia, phonophobia,
excess sweating, abdominal pain, flushing, worsening pain in the
lower back, numbness in hands, but improved anxiety with Xanax.
(Tr. 345)

In September 2004, Farrell experienced migraines with visual
disturbances, depression, anxiety, problems with memory, and lack
of concentration.  (Tr. 347)  During the following month, Farrell
reported suicidal thoughts, anxiety, flushing and sweating in
social situations, insomnia, and crying episodes.  (Tr. 468)  Her
GAF was recorded at 50, indicating serious symptoms.  (Tr. 470)

Farrell saw Dr. Obinna Oriaku in November 2004, who con-
ducted a consultative examination and described Farrell as obese
and experiencing a sad affect.  (Tr. 417-18)  He identified
positive trigger points in the intrascapular, subscapular, and
lower back and noted that current medications were not helping

with Farrell's depression. (Tr. 418) Upon examination with Dr. Oriaku, Farrell complained of carpal tunnel syndrome, high blood pressure, fatigue, and a history of both pelvic and sacral pain. (Tr. 416) She had received recurrent steroid injections to her wrists and non-steroidal anti-inflammatory drugs with some relief. Farrell did not take any medication for pain associated with carpal tunnel syndrome and was unwilling to undergo wrist surgery because no physician had assessed her carpal tunnel to be severe enough to require surgery. (Tr. 416) Dr. Oriaku noted that Farrell had a normal range of movement in all limbs, ability to squat, stand on her tiptoes, and touch her toes. (Tr. 418) Dr. Oriaku diagnosed her with capral tunnel syndrome, pelvic and sacral pain, depression, and possible fibromyalgia. Dr. Oriaku ultimately found that Farrell needed ongoing psychiatric help and pain management treatment. (Tr. 418) Farrell also saw Dr. Monica Thomason, a state agency reviewing physician, in November 2004. She said Farrell could lift and carry 25 pounds frequently and 50 pounds occasionally as well as stand, walk, and sit for 6 hours in an 8-hour workday but was limited to frequent handling with her right hand. (Tr. 191, 193)

In December 2004, Dr. Patricia Hogan examined Farrell on a consultative basis but was unable to review her medical records.

(Tr. 438-441) Farrell reported a seven-year history of periodic depression and some suicidal ideation. (Tr. 438) Farrell admitted thoughts of harming herself in the past month and held a plastic knife to her wrist to see how it would feel to cut herself in May 2004. (Tr. 339) Farrell, however, never had attempted suicide and was not receiving any mental health treatment at that time. (Tr. 439) Farrell said she slept just two to three hours per night but was able to drive, perform household chores when necessary, and manage personal finances. (Tr. 439-40) Though Farrell remained able to perform personal hygiene tasks, her husband often had to remind her to care for herself. (Tr. 440) Farrell appeared anxious, did not engage in any social activities, reported problems with concentration and memory, and complained of experiencing two to three panic attacks weekly. (Tr. 440) Farrell suffered from sadness, worry, decreased interest and energy, social withdrawal, and suicidal thoughts, but she exhibited no problems with motor activity, gait, or posture during examination. (Tr. 438, 440) With the exception of occasional conflicts with co-workers and one supervisor, Farrell stated she had gotten along well with her peers and supervisors at her past job. (Tr. 439) Dr. Hogan said Farrell could follow directions and therefore understood spoken words. (Tr. 440) She further noted appropriate affect, normal remote, recent, and

immediate memory, functioning within the average range of intelligence, no sign of hallucinations, but slight difficulty with delayed recall and concentration.  (Tr. 440-41)  Dr. Hogan ultimately diagnosed Major Depression, Recurrent, Moderate to Severe, and Social Anxiety.  (Tr. 441)

Later that month, Farrell saw Dr. W. H. Perkins, a state agency reviewing physician, who reported that Farrell had moderate difficulties with daily living activities, maintaining social functioning, and maintaining concentration without episodes of decompensation.  (Tr. 212)  Dr. Perkins noted Farrell's capabilities of performing simple, routine tasks and indicated that positions in low stress environments with low production demands and limited public contact would be appropriate.  (Tr. 200)  In January 2005, Farrell consulted Dr. Beyer, reporting dizziness with vomiting.  (Tr. 348)  She also experienced tenderness at all fibromyalgia pressure points tested.  (Tr. 348)  Farrell was instructed to wear braces and avoid repetitive movements to improve her carpel tunnel syndrome.  (Tr. 348)

Two months later, Farrell's right finger was drained of fluids, resulting in immediate relief.  (Tr. 349)  Upon examination, Farrell was found to suffer from increased psychomotor activity, decreased speech, and increased anxiety.  (Tr. 395-96)  She was assigned a GAF of 46, indicating serious symptoms.  (Tr.

395)  In late March, Dr. Martha Smith, a psychiatrist, conducted
a functional assessment and diagnosed severe recurrent major
depression.  (Tr. 659)  Farrell was found to suffer from fibro-
myalgia, chronic back pain, low motivation, poor nutrition,
social withdrawal, and an inability to work.  (Tr. 659-60) Dr.
Smith assigned Farrell a GAF score of 44, indicating that her
condition was "very severe" with "poor response to medication and
treatment."  (Tr. 659)

In mid April 2005, Farrell complained of an irregular
heartbeat, migraines, diarrhea from nerves, loss of sex drive,
carpal tunnel syndrome, anger, nausea, insomnia, poor memory, and
constant worry.  (Tr. 350)  Dr. Beyer noted continuing pain in
the right index finger, fibromyalgia, depression, and anxiety and
referred Farrell to Dr. Hutchinson for the right index finger
pain. (Tr. 351)  Though cortisone injections previously had
helped and inflammation had improved, Farrell continued experi-
encing pain and difficulty using her finger.  (Tr. 505)  The
joint itself was well-maintained, but the right PIP joint was
tender with mild diffuse soft tissue thickening, and X-rays
revealed calcification of uncertain etiology.  (Tr. 505)  Dr.
Hutchinson prescribed therapy for range of motion exercises.
(Tr. 504)

The following month, Farrell reported improvements in her
mental health but continued to see Dr. Beyer. (Tr. 521-22)
Farrell complained of two to three migraines per month but said
some medications were helping. (Tr. 352) Farrell continued
taking multiple medications and said that Wellbutrin prescribed
for her depression did not worsen her anxiety and increased her
energy. (Tr. 521) Immitrex helped with migraines while Zanaflex
helped control pain symptoms. (Tr. 521) Farrell also suffered
from joint pains from fibromyalgia, depression, and anxiety while
judgment and insight were fair. (Tr. 352, 521) Dr. Beyer
indicated that Farrell had normal range of motion and strength in
her limbs but noted multiple tender pressure points without
specifying how many. (Tr. 521) Dr. Beyer completed a Medical
Source Statement form noting that Farrell was not working as a
result of depression, anxiety, chronic pain, and fatigue. (Tr.
354-356) Farrell also suffered from shortness of breath and
vertigo but was capable of lifting and carrying ten pounds
frequently and 20 pounds occasionally, standing or walking for
one hour in an eight-hour workday, and sitting for three hours in
an eight-hour workday. (Tr. 354, 356) Dr. Beyer said that
Farrell would need to elevate both legs periodically at work but
could operate leg controls for both legs occasionally as well as
perform simple grasping, pushing, pulling, and reaching in all

directions.  (Tr. 354-55)  Farrell could bend occasionally but
never crawl, kneel, climb, or squat.  (Tr. 355)  Dr. Beyer sug-
gested that Farrell avoid concentrated exposure to extreme
temperature, humidity, noise, wetness, fumes, odors, vibration,
dust, poor ventilation, unprotected heights, gasses, and moving
machinery.  (Tr. 355) Ultimately, Dr. Beyer assessed Farrell as
substantially limited.  (Tr. 354-356)

Farrell complained of worsening fibromyalgia and exhaustion
and saw Dr. Ahmad Kashif, a rheumatologist, in June 2005.  (Tr.
442-43)  He noted her history of steroid injections for recurrent
pain in the small joints of her hands as well as lower back,
knee, and ankle pain. (Tr. 442)  Dr. Kashif recommended that
Farrell take Mobic for joint pain as well as lose weight to
improve lower back pain.  (Tr. 443)  Farrell also mentioned
muscle spasms in her lower back and morning stiffness in her
hands.  (Tr. 442-43)  Dr. Kashif further reported headaches,
fibromyalgia, depression, anxiety, and social phobia.  Dr. Kashif
also discovered bilateral periarticular tenderness in Farrell's
lower back and hands as well as sacroiliac joint tenderness. (Tr.
442-43) Farrell's symptoms suggested, but were not conclusive, of
inflammatory arthritis.  (Tr. 443)  An x-ray of Farrell's lumbo-
sacral anatomy revealed facet arthrosis and degenerative disc

changes while a Kenalog and Lidocaine injection was administered to treat hand synovitis. (Tr. 442-43)

After completing a Supplemental Attending Physician Statement in support of Farrell's application for short-term disability through her insurance company, Dr. Smith, one of Farrell's psychiatrists, diagnosed Major Depression, Recurrent, Severe and Generalized Anxiety in June 2005. (Tr. 694) Dr. Smith also noted Farrell's inability to work resulting from chronic physical and mental illness and reported that she could stand for only one hour, sit for one hour, or walk for one hour in an eight-hour workday. (Tr. 695) Consequently, Dr. Smith anticipated little improvement as Farrell experienced a limited ability to follow instructions, tolerate stress, interact interpersonally, and concentrate. (Tr. 695)

During the same month, Dr. Wallace completed an Attending Physician Statement supporting Farrell's application for short-term disability through her insurance company. (Tr. 697) Dr. Wallace noted that Farrell had severe limitations in most areas of mental functioning and was unable to work at that time, but he predicted some improvement, albeit slow, in Farrell's functioning. (Tr. 698, 700)

Following Dr. Wallace's recommendations, Dr. Robert Pyle, Jr., a state agency reviewing physician, noted that Farrell could

lift and carry 25 pounds frequently and 50 pounds occasionally as well as sit, stand, or walk for six hours in an eight-hour workday. (Tr. 215)

During July 2005, Dr. Kashif increased Farrell's Mobic dosage after she reported slight improvement with the medication. (Tr. 444) She continued to experience bilateral decreased range of motion in her hands, tenderness in the trochantric area, and lumbar spasms. (Tr. 444) Dr. Kashif diagnosed inflammatory arthritis and administered injections of Kenalog and Lidocaine to Farrell's hip region which caused some relief. (Tr. 444) The same month, Dr. W. O. Mann, a state agency reviewing psychiatrist, noted that Farrell had mild restrictions in daily activities as well as moderate difficulties in maintaining social functioning with one or two episodes of decompensation. (Tr. 232) Dr. Mann indicated that Farrell should be capable of performing jobs requiring limited social interaction and simple tasks. (Tr. 238) The following month, Farrell notified Dr. Kashif of pain in her hands. (Tr. 445) Dr. Kashif continued his diagnosis of fibromyalgia and inflammatory arthritis but said Farrell did not meet the diagnostic criteria of lupus and recommended that she stop taking Mobic and restart Zanaflex. (Tr. 445)

Farrell saw Dr. Beyer in January 2006, and complained of depression, back pain, fatigue, problems bending, and fibro-myalgia. (Tr. 527) Farrell also saw Dr. F. A. Breslin, a state agency reviewing psychologist, who noted Farrell's mild restric-tions in daily activities as well as moderate difficulties in maintaining concentration with one or two episodes of decompensa-tion. (Tr. 232) Dr. Breslin concluded that Farrell could com-plete simple tasks but could not complete detailed tasks and that her contact with the general public and co-workers should be infrequent and casual. (Tr. 265)

Between March and May 2006, Farrell experienced increasing hip pain, difficulty walking, and disturbed sleep. Dr. Kashif noted muscle spasms and "significant limitation on external rotation." (Tr. 487) Farrell received an injection, and an x-ray revealed mild to moderate degenerative changes of the sacroiliac joints and pubic symphisis. (Tr. 487-88)

More than a year later, Farrell continued suffering from depression and anxiety and moved to Indiana in July 2007, where she arranged counseling with Dr. Jayati Singh at the Alpine Counseling Center. (Tr. 705) Farrell had been scraping her wrist with a plastic knife for about four months, and her GAF score was between 55 and 58, indicating mild symptoms. (Tr. 705, 707) Farrell had good eye contact, normal speech, a coherent

thought process, and no evidence of psychosis. (Tr. 706) While
attention, concentration, and memory were within normal limits,
Dr. Singh indicated that Farrell had a sad and anxious mood and
diagnosed her with Major Depression, Recurrent, Moderate Inten-
sity and Anxiety Disorder, Not Otherwise Specified. (Tr. 706-
707) Dr. Singh recommended Xanax, Wellbutrin, Trazodone, and
Cymbalta. (Tr. 707) The following month, Farrell admitted to
cutting her wrist with a plastic knife to relieve stress. (Tr.
709)

When her suicidal ideation resurfaced, Farrell admitted
herself to St. Vincent Stress Center from September 28, 2007 to
October 4, 2007. (Tr. 665) The attending physician said that
Farrell made good eye contact, cooperated, stayed calm, and
presented good insight and judgment but that she suffered from
depression, anxiety, and restricted range of affect. (Tr. 666)
He further noted Farrell's tendency to over-exaggerate symptoms.
(Tr. 666) Farrell was assigned a GAF of 60 and diagnosed with
Major Depressive Disorder, Recurrent, Moderate. (Tr. 665) The
physician increased Farrell's dosage of Cymbalta and added
Abilify to further control anxiety. (Tr. 666) With these
changes in medication, Farrell's sense of calmness and verbal
activities improved. (Tr. 666) She was not suicidal, homicidal,
or psychotic upon discharge. (Tr. 666)

Farrell began treatment with Dr. Ryan Loyd, D.O., in December 2008, as she suffered from stabbing and aching sensations, often worsened by weather and too much or too little activity. (Tr. 611)  All 18 fibromyalgia points were tender, and trigger point injections were administered.  (Tr. 612)  Though the injections helped for about ten days, Farrell continued to rate her pain at 8/10 with treatment and 10/10 without.  (Tr. 605)

During January 2009, Farrell experienced full body pain with a diagnosis of fibromyalgia and depression with suicidal tendencies.  (Tr. 600-01)  Farrell again received trigger point injections in the gluteal that relieved some pain for about two days while cervical injections helped longer.  (Tr. 600)  A lumbar MRI demonstrated a sacralized L5 segment, diffuse herniation at L4-L5 with moderate compromise of the left lateral recess and proximal neuroforaman, mild stenosis, and moderate degenerative hypertrophy, L2 to L5.  (Tr. 596)  A left knee MRI revealed bursitis or contusion while an x-ray revealed mild disc narrowing at L4. (Tr. 596)  Farrell received a series of steroid injections between January and August, and the injections helped reduce her pain to a 6.5/10.  (Tr. 578)  Farrell reported 80% improvement after receiving the injections and a bilateral lumbar medial branch block.  (Tr. 573) Farrell tested positive for 16 of 18 fibromyalgia tender-points.  (Tr. 579)

In September 2009, treatment improved Farrell's ability to turn over in bed and dress her child, but she continued experiencing problems with sitting too long, twisting, bending, or walking. (Tr. 568) Farrell continued to rate pain at an 8/10 without treatment but a 7/10 with treatment. (Tr. 568) Farrell received more medial branch blocks and radio-frequency treatments from L2 to L5. (Tr. 566, 463)

At the hearing before the ALJ, medical expert Dr. Paul Boyce testified. (Tr. 753) He stated that without any evidence of joint deformity or activity inflammation, Farrell had been diagnosed with arthritis. (Tr. 755) Though Farrell's medical records repeatedly mentioned fibromyalgia, the records failed to demonstrate that she had suffered tenderness in at least 11 of the 18 tender points required to meet the diagnostic criteria of the impairment. (Tr. 756) The records did indicate, however, that Farrell often experienced a normal gait and range of motion in her limbs. (Tr. 756) Consequently, Dr. Boyce said that Farrell did not meet or equal a listed impairment. (Tr. 757) Dr. Boyce noted that Farrell remained capable of performing light work, but due to continuing pain in the PIP and MCP joints in her hands, she should be limited to frequent use of the hands for grasping and should avoid work environments with extreme heat, cold, or humidity. (Tr. 758)

Psychological medical expert Dr. Jack Thomas testified in May 2008, before the ALJ at Farrell's administrative hearing. (Tr. 759) Dr. Thomas indicated that Farrell suffered from Major Depressive Disorder that varied from mild to severe, Anxiety Disorder, and Personality Disorder, Not Otherwise Specified. (Tr. 760-61) With the exception of depression and anxiety, Dr. Thomas considered Farrell's mental status largely within normal limits. (Tr. 762) Though Farrell had been hospitalized, the record demonstrated that her symptoms had improved before her discharge. (Tr. 762) Farrell's impairments did not meet or equal a listed impairment, and she was capable of performing simple, repetitive tasks but should be limited to occasional public contact. (Tr. 763-64)

Farrell was next to testify before the ALJ. (Tr. 775) Farrell discussed her initial hospitalization: she left work and admitted herself on November 4, 2003, after experiencing suicidal thoughts for several months and developing a suicide plan. Farrell never returned to work and claimed she was disabled. (Tr. 775) Farrell also was hospitalized in September 2007, for suicidal thoughts and feelings of worthlessness. (Tr. 779) Farrell said she had no interests outside her home, slept about 12 hours a day, watched television while awake, and only was able to do light household work while her husband completed most of the

chores and cared for the children.  (Tr. 776, 782-83)  Farrell
then described her current medical treatment.  (Tr. 776)  Dr.
Singh was prescribing all of her psychiatric medications.  (Tr.
776)  Farrell said she was taking her medications but experienc-
ing side effects such as fatigue.  (Tr. 777)

Farrell then described her alleged physical disabilities
including degenerative joint disease of her back.  (Tr. 777)
Farrell next addressed her functional problems, stating that she
could not stand for longer than 15 minutes.  (Tr. 777)  Further-
more, she stated she could sit for only about 15 minutes and walk
less than a block due to body pain that she rated at an 8/10 and
7/10 with medication.  (Tr. 778)  Farrell said that she tried
heat, ice, and elevation to alleviate the pain but with no suc-
cess.  (Tr. 779) Farrell's plantar fascitis of the feet caused
her further troubles with walking, bending, and stooping.  (Tr.
780)  Additionally, Farrell could not lift more than ten pounds.
(Tr. 779) Finally, Farrell discussed her previously stressful
relationship with her husband but said the two had reconciled.
(Tr. 781)

Vocational expert (VE) Constance Brown also testified on
March 20, 2008, describing Farrell's employment history.  (Tr.
785)  Brown described most of Farrell's previous positions as

sedentary and semi-skilled or skilled.  (Tr. 786)  The ALJ then posed a series of hypothetical questions.  (Tr. 786)

In the first hypothetical, the ALJ asked the VE to assume that a 36-year-old individual with a high school degree and three years of college, with a similar employment history to Farrell could perform light work requiring simple and routine tasks with limited contact with the general public.  (Tr. 786-87)  From her experience, the VE responded that Farrell's previous line of work would not be appropriate but offered examples fitting the ALJ's proposed hypothetical including a housekeeper/cleaner (17,000 jobs), an office machine operator (1,300 jobs), and electronic assembly (5,400 jobs).  (Tr. 787, 789) The VE said these were all unskilled positions, requiring 40 hours of work per week.  (Tr. 788) Therefore, an individual with excessive absences could not maintain these jobs.  (Tr. 789)

For the second hypothetical, the ALJ asked the VE to assume the same facts stated above but added the requirement of avoiding extremes of heat, cold, or high humidity.  The VE responded with the same employment examples.  (Tr. 787)

In his decision, the ALJ initially stated that Farrell met the insured status requirements of the Social Security Act through December 31, 2009, and discussed the five step evaluation process for determining whether a claimant was disabled.  (Tr.

62)  Under step one, the ALJ determined that Farrell had not

engaged in substantial gainful activity since November 2003.

(Tr. 62)  In step two, the ALJ found that Farrell had the follow-

ing severe impairments: depression, anxiety, and fibromyalgia.

(Tr. 62)  At step three, the ALJ determined that Farrell did not

have an impairment or combination of impairments that met or

medically equaled one of the listed impairments.  (Tr. 68)

Specifically, Farrell's fibromyalgia pain has been controlled

with medications while her depression and anxiety were caused

primarily by stressors from home such as her abusive husband.

Furthermore, Farrell repeatedly had said she would not carry

through with her suicidal ideations.  (Tr. 68)

In determining Farrell's RFC, the ALJ considered all symp-

toms and the extent to which those symptoms could be accepted as

consistent with the evidence presented.  (Tr. 69)  The ALJ

determined that Farrell might have experienced panic attacks,

body pain, migraines, depression, weight problems, insomnia,

irritable bowel syndrome, carpal tunnel syndrome, side effects

from medications, decreased functional abilities, and problems

caring for her children but that her statements regarding the

intensity, duration, and limiting effects of these problems were

not entirely credible.  (Tr. 69) For example, Farrell exhibited a

normal gait with full range of motion in all joints and consis-

tently had denied significant back pain following treatment with medication. (Tr. 34) Furthermore, Dr. Thomas stated that Farrell's psychological symptoms improved with medication. (Tr. 33) The ALJ ultimately found that Farrell had the ability to perform light work with non-exertional limitations precluding production type work, employment dealing with the general public, frequent fingering with the right index finger, and sustained skilled concentration. (Tr. 70) Under step four, the ALJ found that Farrell could not perform any past relevant work. (Tr. 70) Under step five, after considering Farrell's age, education, work experience, and RFC, the ALJ determined that significant numbers of jobs exist in the national economy that Farrell could perform. (Tr. 71) Therefore, the ALJ found Farrell not disabled. (Tr. 72)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Sub-

stantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852, (1972) (*quoting Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the deci- sion cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable

> to engage in any substantial gainful activity by reason of any medically determinable phys- ical or mental impairment which can be ex- pected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

> 42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20

C.F.R. §404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b).  If she is, the claimant is not disabled, and the evaluation process is over.  If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §404.152(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that

such work exists in the national economy.  42 U.S.C. §423(d)(2);
20 C.F.R. §404.1520(f).

Farrell raises four challenges to the ALJ's denial of
disability benefits, including: whether the ALJ erred in his
assessment of Farrell's impairments and their combined effects
upon her ability to function; whether the ALJ properly determined
Farrell's RFC; whether the ALJ properly assessed Farrell's
credibility; and whether the ALJ incorrectly determined that
Farrell was capable of performing alternative work in light of
her impairments.  Farrell first challenges the ALJ's assessment
of her impairments and their combined effects upon her ability to
function, arguing specifically that the ALJ erred because he did
not find Farrell's fibromyalgia to be a severe impairment.

The listings describe the impairments that are considered
"severe enough to prevent an individual from doing any gainful
activity, regardless of his age, education, or work experience."
20 C.F.R. §404.1525(a); *Barnett v. Barnhart*, 381 F.3d 664, 668
(7th Cir. 2004) (describing the listed impairments as presump-
tively disabling).  The Supreme Court has emphasized that, "for a
claimant to show that his impairment matches a listing it must
meet *all* of the specified medical criteria." *Sullivan v. Zebley*,
493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990)
(emphasis in original).  *See also Sims*, 309 F.3d at 428 (relying

on same).  A claimant must meet the criteria in the capsule definition, as well as the criteria in the subsidiary paragraphs. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Scott*, 297 F.3d at 595 n.6.  An impairment that manifests only some of the specified criteria, no matter how severely, does not qualify.  *Sullivan*, 493 U.S. at 530, 110 S.Ct. at 891.

If an impairment does not match a listed impairment, the ALJ then must consider whether the impairment is medically equivalent to a listed impairment.  20 C.F.R. §404.1529(b)(3).  Where a claimant has a "combination of impairments, not one of which meets a listing, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing."  20 C.F.R. §404.1526(b)(3).

Farrell argues that the ALJ incorrectly determined that she did not have fibromyalgia and did not satisfy the Listing.  To meet the Listing for fibromyalgia, the claimant must test posi- tive for at least 11 of the 18 traditional fibromyalgia tender spots.  (Tr. 29) However, none of the physicians whose opinions were presented to the ALJ at the hearing made such a finding. (Tr. 348, 579, 612, 756)  Dr. Beyer reported that Farrell tested

positive at some pressure points but did not specify how many.
(Tr. 348, 352)  Dr. Kashif referred to Farrell's ailments as
"fibromyalgia type symptoms" but made no mention of testing
positive at 11 of the 18 pressure points.  (Tr. 445)  Dr. Boyce
testified that Farrell's medical records did not document any
clinical findings that Farrell experienced tenderness at 11 of
the 18 spots required to support a fibromyalgia diagnosis.  (Tr.
756)  The majority of physicians noted that Farrell complained of
fibromyalgia but did not record actual testing for tenderness in
the 18 pressure points.  (Tr. 351, 418, 442-43, 659) Based on the
evidence presented at the hearing, the record was devoid of
objective medical evidence tending to show that Farrell met the
Listing for fibromyalgia, and the ALJ was justified to conclude
that Farrell's impairments were not severe enough or of equal
medical significance to meet a listed medical impairment.
*Sullivan*, 493 U.S. at 530, 110 S.Ct. at 891. Consequently, the
ALJ did not err in failing to assess Farrell's alleged fibro-
myalgia as a severe impairment.

    After the hearing before the ALJ, Farrell submitted supple-
mental evidence to the Appeals Council addressing her fibro-
myalgia, including Dr. Ryan Loyd's assessment of her condition.
(Tr. 579)  Farrell claims that Dr. Loyd diagnosed fibromyalgia
after finding tenderness in 16 pressure points on one occasion

and 18 on another.  (Tr. 579, 612)  Farrell argues that if the medical expert had the opportunity to review this evidence considered by the Appeals Council, the medical expert would have altered his testimony in Farrell's favor.

As an initial matter, the court will not consider additional evidence that was not properly submitted to the ALJ prior to the date of his decision.  42 U.S.C.A. §405(g); *Rice*, 384 F.3d at 366 n.2 (*citing Eads v. Sec. of Dept. Of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).  Such evidence cannot be the basis of a finding of reversible error because the ALJ did not have the opportunity to consider it.  *Rice*, 384 F.3d at 366. However, even if the court were to consider this additional evidence, Farrell did not show that Dr. Loyd's opinion was conclusive proof that she met a Listing.  Farrell failed to explain how Dr. Loyd's opinion was consistent with the objective medical evidence and physicians' opinions presented to the Medical Expert at the hearing, nor did Farrell provide an explanation for why the ALJ should adopt Dr. Loyd's opinion despite the multitude of evidence contrary to his opinion.  The ALJ was not required to adopt Dr. Loyd's findings when substantial evidence supported his decision to the contrary.  *See* 42 U.S.C. §405(g) (explaining that the ALJ's opinion will not be overturned where it is supported by substantial evidence).  Ultimately, the court cannot address this

evidence, and even if this evidence were addressed, the medical evidence taken as a whole does not corroborate Dr. Loyd's opinion.

Second, Farrell challenges the Commissioner's evaluation of her RFC. SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. (footnote omitted)
>
> SSR 96-8p

Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he

33

must provide a 'logical bridge' between the evidence and his conclusions." ***Getch v. Astrue***, 539 F.3d 473, 480 (7th Cir. 2008) (*quoting **Clifford v. Apfel***, 227 F.3d 863 (7th Cir. 2000)).

Farrell disputes the ALJ's RFC determination, arguing that his assessment was not based upon the record as a whole. First, Farrell claims the ALJ accorded little weight to the opinions of Farrell's treating physicians and incorrectly adopted the findings of the testifying medical experts. The opinions of treating physicians are entitled to controlling weight when adequately supported by the medical record and consistent with other substantial evidence. ***Campbell v. Astrue***, 627 F.3d 299, 306 (7th Cir. 2010). A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2). *See also **Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007); ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford***, 227 F.3d at 870 *(quoting **Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)). *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons in our

notice of determination or decision for the weight we give your
treating source's opinion.").

Internal inconsistencies in a treating physician's opinion
may provide a good reason to deny it controlling weight. 20
C.F.R. §404.1527(c)(2); *Clifford*, 227 F.3d at 871. Furthermore,
controlling weight need not be given when a physician's opinions
were inconsistent with his treatment notes or were contradicted
by substantial evidence in the record, including the claimant's
own testimony. *See e.g. Latkowski v. Barnhart*, 93 Fed. Appx.
963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx.
939, 942 (7th Cir. 2004). Ultimately, the weight accorded a
treating physician's opinion must balance all the circumstances,
with recognition that, while a treating physician "has spent more
time with the claimant," the treating physician also may "bend
over backwards to assist a patient in obtaining benefits . . .
[and] is often not a specialist in the patient's ailments, as the
other physicians who give evidence in a disability case usually
are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)
(internal citations omitted).

The opinions of Farrell's treating physician, Dr. Beyer,
were riddled with broad, sometimes inconsistent statements and
often were inconsistent with the medical record as a whole. (Tr.
352, 354) For example, Dr. Beyer noted that Farrell could sit

for three hours and walk for just one hour in an eight hour work day.  (Tr. 354)  Other physicians, including Dr. Pyle and Dr. Thomason, disagreed and reported that Farrell could sit, stand, or walk for a period of six hours in an eight hour work day. (Tr. 191, 193, 354, 215) Dr. Beyer said Farrell was not working as a result of "multiple medical problems."  (Tr. 354)  These broad, conclusory statements, however, were not supported by any clinical findings and are not entirely reliable.  *See* 20 C.F.R. §404.1527(d)(2) (noting that treating physicians' opinions will be given controlling weight only if they are "well supported by medically acceptable clinical and laboratory diagnostic tech- niques and is not inconsistent with the other substantial evi- dence in your case record.").  Furthermore, Dr. Beyer noted that Farrell experienced knee tenderness, hand stiffness, and mental disorders, but the record does not establish the severity or duration of these problems.  (Tr. 352)  During this same examina- tion, Dr. Beyer recorded that Farrell had a normal range of motion and strength in both her upper and lower extremities. (Tr. 352) Furthermore, Dr. Beyer was not a psychiatrist, so her opinion on Farrell's mental disorders should be attributed little weight.  *See* 20 C.F.R. §404.1527(d)(5).

Ultimately, the ALJ accounted for many of Dr. Beyer's suggestions recorded in a Medical Source Statement including

Farrell's ability to lift 20 pounds, bend, grasp, finger, push, and pull occasionally as well as her need to avoid extremes of heat, cold, or humidity. (Tr. 355, 31) Because Dr. Beyer's opinions were not supported by clinical findings and tests, they were not entitled to controlling weight. Rather, the ALJ was permitted to analyze the record as a whole and to assign weight accordingly.

Interrelated with the first claim, Farrell argues that the record shows that she was unable to perform the six hours of walking and standing required to complete light work. These assertions, however, were unsupported. First, Dr. Pyle, a state agency reviewing physician, stated that Farrell could sit, stand, or walk for a period of six hours in an eight hour work day. (Tr. 215) Though Dr. Smith concluded that Farrell could walk, sit, or stand for a period of only one hour in an eight-hour work day, this opinion was given less weight because Dr. Smith was a psychiatrist, and Farrell's physical functionality was outside the scope of Dr. Smith's specialization. *See* 20 C.F.R. §404.1527(d)(5) (giving "more weight to the opinion of a special-ist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Furthermore, Farrell argues that fibromyalgia and a diffuse herniation at L4-5 impair her ability to walk, but as previously

discussed, she failed to prove that she suffered from fibro-
myalgia.  (Tr. 596)

Farrell also argues that the ALJ incorrectly determined that
she was capable of frequent hand use.  To support this argument,
Farrell relies entirely on the opinions of Dr. Beyer and Dr.
Kashif.  This reliance is problematic as it does not represent
Farrell's medical records as a whole. Though Dr. Beyer recorded
that Farrell experienced numbness and tingling in her hands as
well as right index finger pain, Dr. Beyer also noted that
Farrell had a normal range of motion and strength in both her
upper and lower extremities.  (Tr. 352) These statements were
contradictory because if Farrell was experiencing severe numb-
ness, tingling, and pain in her hands and fingers, it reasonably
would follow that her strength in her upper extremities would
suffer as well.  (Tr. 352) Additionally, Dr. Kashif initially did
not diagnose inflammatory arthritis.  (Tr. 443)  When he later
diagnosed it, Dr. Kashif noted that Mobic helped dull Farrell's
arthritic pain.  (Tr. 486)  Dr. Kashif further stated that
steroid injections helped reduce Farrell's hand pain.  (442, 444-
45)  Therefore, even if Farrell suffered from inflammatory
arthritis, medications and injections dulled the pain.

Farrell further argues that the ALJ incorrectly assessed her
limited mental abilities.  Contrary to Farrell's argument, the

ALJ accounted for Farrell's mental impairments by limiting her to simple, repetitive tasks requiring only occasional contact with the public. (Tr. 31) After reviewing the entire medical record, the ALJ's decision coincided with the testimony and reports of Dr. Thomas, Dr. W. H. Perkins, Dr. Breslin, and Dr. W. O. Mann. The record reflects that the ALJ considered Dr. Mann's opinion that Farrell should be capable of performing jobs requiring limited social contact. (Tr. 198) Dr. Perkins agreed, stating that Farrell was suited for positions requiring simple decision-making and limited public contact. (Tr. 238) Likewise, Dr. Thomas reviewed the entire record and agreed that Farrell was capable of performing simple, repetitive tasks in a position that required limited public interaction. (Tr. 763-64) Farrell interpreted Dr. Thomas' testimony to mean that she was far more limited than acknowledged by the ALJ. (Tr. 763-765) Farrell based this interpretation on Dr. Thomas' discussion of her recurrent depression. (*See* Pltf. Br. at p. 25) This interpreta-tion, however, is inaccurate because although Dr. Thomas acknowl-edged Farrell's depression, the medical expert concluded that Farrell remained capable of performing simple tasks despite her mental limitation. (Tr. 763-64) Additionally, Dr. Breslin recorded that Farrell could complete simple tasks without limits and could have casual public contact. (Tr. 265)

Despite the ample evidence to support the ALJ's decision, Farrell challenges the weight the ALJ assigned to Dr. Hogan and Dr. Beyer's opinions. However, the ALJ was correct to accord little weight to Dr. Hogan and Dr. Beyer's opinions because they did not support a finding to the contrary and were not supported by the record as a whole. For example, although Farrell argues that Dr. Hogan found Farrell somewhat anxious, Dr. Hogan also opined that Farrell was capable of performing simple tasks such as calculations in her head and managing her funds. (Tr. 440-41) Additionally, Farrell relies heavily on Dr. Beyer's opinion, but Dr. Beyer determined that Farrell was fully able to return to work as early as August 11, 2003. (Tr. 693) Ultimately, the medical evidence did not corroborate Dr. Beyer's records, and her notes contained many general statements and inconsistencies. The record overall reflected that Farrell was capable of returning to work and had sufficient mental capacity to complete routine tasks. Farrell has not pointed to one physician who concluded otherwise, and the limitations the ALJ put in place account for the difficulties in social interaction Farrell faced.

Farrell also argues that the limitations found by reviewing state agency physicians greatly exceeded those recognized by the ALJ. (Tr. 236-37, 263-64) For example, Farrell claims that the ALJ did not accord proper weight to being markedly limited in the

ability to interact appropriately with the general public. (Tr. 237) This argument is without merit, because the ALJ did limit Farrell to alternative work that required only occasional contact with the public. (Tr. 31, 786) Aside from this single category, Dr. Mann recorded that Farrell was just moderately limited in a few categories and not significantly limited in most categories. (Tr. 236-238). Additionally, Dr. Breslin also recorded that Farrell was not markedly limited in any category and only moderately limited in some categories such as the ability to maintain attention and concentration for extended periods. (Tr. 263-64) Again, the ALJ adequately considered these moderate limitations by limiting Farrell to work that required only simple and repetitive tasks. (Tr. 31)

When assessing RFC, the ALJ is not required to consider every piece of medical evidence, and following the opinions of four medical experts was sufficient. Ultimately, Farrell's argument that the ALJ did not correctly assess her impairments is without merit because he provided a narrative discussion citing specific medical records and non-medical facts in support of each conclusion. (Tr. 33-34) The ALJ further discussed Farrell's ability to perform sustained work activities in an ordinary work setting on a regular basis. (Tr. 33-34) The ALJ's restriction to light work accommodated Farrell's impairments by limiting her

to work that did not require constant use of the bilateral hands for fine fingering and grasping, exposure to extreme heat, cold, or humidity, detailed or complicated tasks, or frequent contact with the public. (Tr. 31) Additionally, the ALJ described the maximum amount of each work-related activity Farrell could perform based on the evidence available in the case record accounting for Farrell's grasping, sitting, standing, walking, and lifting limitations. (Tr. 31)

The ALJ also considered and resolved the material inconsistencies in the record. For instance, he gave greater weight to reports from the state reviewing agency physicians only after concluding that the reports were supported by the extensive medical records as discussed above. (Tr. 34) While the state reviewing agency physicians' reports were consistent, the examinations conducted by Farrell's treating physicians and psychiatrists were inconsistent with each other and the state reviewing agency physicians and consequently given less weight. (Tr. 34, 438, 568, 611) Therefore, the ALJ correctly determined that Farrell had the RFC to perform light work.

Farrell's third challenge is that the ALJ erred in finding Farrell's allegations less than fully credible. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt*, 496 F.3d

at 843; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703

(7th Cir. 2004).  If the claimant's impairments reasonably could

produce the symptoms of which the claimant is complaining, the

ALJ must evaluate the intensity and persistence of the claimant's

symptoms through consideration of the claimant's "medical his-

tory, the medical signs and laboratory findings, and statements

from [the claimant, the claimant's] treating or examining physi-

cian or psychologist, or other persons about how [the claimant's]

symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt*,

395 F.3d at 746-47 ("These regulations and cases, taken together,

require an ALJ to articulate specific reasons for discounting a

claimant's testimony as being less than credible, and preclude an

ALJ from merely ignoring the testimony or relying solely on a

conflict between the objective medical evidence and the claim-

ant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally

unsupported by the medical evidence, the ALJ may not make a

credibility determination "solely on the basis of objective

medical evidence."  SSR 96-7p, at *1.  *See also* *Indoranto v.*

*Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barn-*

*hart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling,

the fact that its source is purely psychological does not disen-

title the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability

to work, the ALJ must obtain detailed de-
scriptions of the claimant's daily activities
by directing specific inquiries about the
pain and its effects to the claimant.  She
must investigate all avenues presented that
relate to pain, including claimant's prior
work record, information and observations by
treating physicians, examining physicians,
and third parties.  Factors that must be
considered include the nature and intensity
of the claimant's pain, precipitation and
aggravating factors, dosage and effectiveness
of any pain medications, other treatment for
relief of pain, functional restrictions, and
the claimant's daily activities.  (internal
citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
1994)

*See also Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir.

2001).

In addition, when the ALJ discounts the claimant's descrip-

tion of pain because it is inconsistent with the objective

medical evidence, he must make more than "a single, conclusory

statement . . . . The determination or decision must contain

specific reasons for the finding on credibility, supported by the

evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and

the reasons for that weight."  SSR 96-7p, at *2.  *See Zurawski*,

245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir.

1995) (finding that the ALJ must articulate, at some minimum

level, his analysis of the evidence).  He must "build an accurate
and logical bridge from the evidence to [his] conclusion." *Zuraw-
ski*, 245 F.3d at 887 (*quoting* *Clifford*, 227 F.3d at 872).  When
the evidence conflicts regarding the extent of the claimant's
limitations, the ALJ may not simply rely on a physician's state-
ment that a claimant may return to work without examining the
evidence the ALJ is rejecting.  *See* *Zurawski*, 245 F.3d at 888
(*quoting* *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986))
("Both the evidence favoring the claimant as well as the evidence
favoring the claimant's rejection must be *examined*, since review
of the substantiality of evidence takes into account whatever in
the record fairly detracts from its weight.") (emphasis in origi-
nal).

    Farrell argues that the ALJ's credibility determination was
not supported by the record.  After reviewing the record, the ALJ
concluded that Farrell's impairments could possibly cause her
alleged symptoms, but her "statements concerning the intensity,
persistence, and limiting effects of [those] symptoms are not
credible to the extent they are inconsistent with the residual
functional capacity assessment."  (Tr. 33)  Specifically, Farrell
argues that the ALJ arrived at four incorrect conclusions.
First, Farrell asks the court to consider the ALJ's finding that
Farrell could complete significant daily activities.  (Tr. 34)

Farrell disagrees, claiming she needed reminders from her husband to complete personal hygiene tasks, continued experiencing recurrent panic attacks, and could not engage in social activities outside the home. (Tr. 171, 440) The ALJ correctly determined that Farrell's subjective complaints were not "sufficiently reasonably consistent" with the medical record. (Tr. 33) In fact, Farrell's daily activities and admissions reveal inconsistencies and an adequate level of functioning. (Tr. 33-35) For example, she reported "taking care of her family before herself" and "babysitting" for her husband in 2005 as well as the ability to handle personal finances and complete housework. (Tr. 34, 30)

Second, Farrell argues the ALJ incorrectly concluded that Farrell was not credible insofar as her testimony that certain factors aggravated her symptoms, including social interaction, weather, extended periods of sitting, bending, walking, and twisting. (Tr. 34, 438, 568, 611) The ALJ, however, noted that Farrell reported no difficulty with social interaction while shopping, attending medical appointments, or during her previous employment. (Tr. 30) Additionally, while Dr. Smith, a psychiatrist, reported that Farrell could stand for only one hour, sit for one hour, or walk for one hour in an eight-hour workday, Dr. Pyle, a physician, said Farrell could stand, sit, or walk for six hours. (Tr. 695, 215) The ALJ reasonably attributed greater

47

weight to Dr. Pyle's opinion because determining an individual's physical functioning capabilities is outside of Dr. Smith's area of specialization. 20 C.F.R. §404.1527(d)(5) (giving "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Therefore, the ALJ was correct in giving little weight to Dr. Smith's opinion. *See Schmidt,* 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician.").

Third, Farrell claims the ALJ incorrectly found that she did not experience side effects from various medications. (Tr. 34) Farrell then listed the side effects she experienced from multiple medications. (Tr. 34, 330, 391, 345) The ALJ, however, adhered to the opinions of several physicians, finding that many medications actually helped Farrell by reducing her pain level. (Tr. 34) Dr. Wallace repeatedly stated that Farrell tolerated her medicines fairly well. (Tr. 389, 392) In fact, Farrell admitted that Lyrica helped with her total body pain. (Tr. 606) While taking Abilify and Cymbalta, Farrell demonstrated an improved sense of calm and became more interactive and verbal. (Tr. 666) Additionally, Farrell exhibited a normal gait with full range of motion in all joints and consistently had denied

significant back pain following treatment with medication.  (Tr. 34)  Furthermore, Dr. Thomas stated that Farrell's psychological symptoms improved with medication.  (Tr. 33)

Finally, Farrell argues that the ALJ erroneously determined that Farrell required no treatment in addition to medicine and counseling.  (Tr. 34)  Farrell claimed she received steroid injections, physical therapy, and advice to use heating rubs, stretches, and back exercises.  (Tr. 578, 346)  For example, Farrell received cortisone injections in her index finger which relieved her pain symptoms for a significant period of time. (Tr. 504-05) Because this additional treatment relieved Farrell's pain, it actually may increase her RFC thereby weakening Farrell's challenges.  (Tr. 504-05) Furthermore, though the ALJ was not required to discuss every piece of evidence, the ALJ considered many of the above treatments. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  For example, the ALJ reasonably discounted the advice to use heating rubs and back exercises because Farrell repeatedly denied experiencing significant back pain following treatment with medication such as Zanaflex.  (Tr. 404, 486)

In the instant case, the ALJ adequately supported his credibility determination with a discussion of the inconsistencies between Farrell's testimony and the objective medical evi-

dence, her treatment history, and daily capabilities. (Tr. 33-35) Ultimately, the ALJ determined that Farrell's impairments could cause the alleged symptoms but that Farrell's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they were inconsistent with his RFC finding. (Tr. 33-34) The court cannot find that the ALJ's credibility determination was patently wrong because it was based on the record as a whole and contained an adequate explanation of Farrell's medical record, daily activities, and medication.

Farrell's fourth and final challenge is that the ALJ erred by failing to satisfy his burden of establishing the existence of alternative work Farrell could perform despite her multiple impairments. (Tr. 35-36) The Commissioner has the burden at step five to establish that given Farrell's condition, she could perform substantial gainful work existing in the national economy. *See Karsarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). At the hearing, the ALJ must ask the VE whether her responses are consistent with the DOT. *Overman v. Astrue*, 546 F.3d 456, 463-64 (7th Cir. 2008). SSR 00-4p also imposes an affirmative duty on the ALJ to elicit a reasonable explanation for any apparent conflicts between the VE's testimony and the DOT. SSR 00-4p, 2000 SSR LEXIS 8; *Overman*, 546 F.3d at 463. Although the claim-

ant no longer forfeits his right to raise the discrepancy on
appeal if he does not challenge it at the hearing, his failure to
identify the conflict places on him the additional burden of
showing that the conflict was so obvious that the ALJ should have
resolved it without assistance. *Overman*, 546 F.3d at 464.

In the case at hand, Farrell argues that although the ALJ
correctly determined that Farrell was incapable of performing
past relevant work, he failed to establish alternative work that
Farrell could perform.  (Tr. 34)  First, Farrell argues that the
ALJ's hypotheticals inadequately considered Farrell's impairments
because they did not account for her limitations in sitting,
standing, and walking.  At the hearing, the ALJ asked the VE to
consider an individual with the residual capacity to perform
light work which was simple and repetitive.  Light work is
defined as work that involves lifting "no more than 20 pounds at
a time with frequent lifting or carrying of objects weighing up
to 10 pounds. Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls."  20 C.F.R.
§416.967. These limitations were consistent with Farrell's RFC as
the ALJ determined and were supported by the evidence of record.
Therefore, the ALJ satisfied his duty by asking the VE whether

the jobs were consistent with his well supported RFC.  It is
immaterial that Farrell believes that she was more limited and
that the ALJ should have questioned the VE about the more re-
stricted limitations.  This would not alter the outcome of Far-
rell's claim because the more restricted limitations she testi-
fied to are not part of her RFC and were not supported by the
objective medical evidence of record.  However, even if the
limitations were supported, Farrell's attorney questioned the VE
about the availability of jobs for someone with these severe
limitations, so the ALJ had the information before him.  There-
fore, Farrell's argument fails on all accounts.

Second, Farrell claims the record does not establish the
consistency of the VE's testimony with the DOT.  (Tr. 36) Far-
rell, however, failed to identify the discrepancy at the hearing
and has now failed to show the court that the conflict was so
obvious that the ALJ should have independently resolved it.
*Overman*, 546 F.3d at 463-64.  During the hearing, the ALJ asked
the VE whether her responses were consistent with the DOT.  (Tr.
789) The VE responded that she used the DOT to determine the
exertional level and skill level thereby basing her job sugges-
tions on the DOT.  (Tr. 789) The VE then proposed three jobs:
housekeeper/cleaner, electric assembly, and office machine
operator.  (Tr. 788, 787)  The VE's assessment that these jobs

would exist in significant numbers was based on 2006 estimates of the U.S. Department of Labor. (Tr. 787) The ALJ relied on the VE's uncontradicted testimony, as he was permitted. ***Liskowitz v. Astrue***, 559 F.3d 637, 745-46 (7th Cir. 2009) ("Where, as here, the VE identifies a significant number of jobs the claimant is capable of performing and this testimony is uncontradicted (and is otherwise proper), it is not error for the ALJ to rely on the VE's testimony."). The burden is now on Farrell to show that a conflict existed that was of such an apparent nature the ALJ should have recognized it on his own accord. However, Farrell not only failed to identify the specific conflict, but made no effort to show why the conflict was so apparent that the ALJ should have recognized it even though Farrell did not object at the hearing. Because Farrell did not meet her burden, the ALJ's decision cannot be overturned on this account.

Finally, Farrell argues that the VE's testimony actually supports the conclusion that Farrell was incapable of alternative work. (Tr. 789) The VE answered the ALJ's inquiry about extensive absences based on her own experience rather than the DOT and stated that excessive absences would preclude an individual from maintaining the proposed job. (Tr. 788-89) From this answer, Farrell concluded that she was incapable of performing the suggested jobs. This conclusion is incorrect, however, because

neither the VE nor the medical records confirmed that Farrell would need excessive absences.  (Tr. 788-89)  Therefore, this argument is without merit.

Ultimately, the ALJ did not err in determining that the alternative work suggested was appropriate for Farrell because the VE based her analysis on the DOT and established that signif-icant numbers of those jobs exist in Indiana. (Tr. 787-89)

————————————

For the foregoing reasons, the decision of the ALJ is **AFFIRMED.**

ENTERED this 19th day of September, 2011

s/ ANDREW P. RODOVICH
United States Magistrate Judge